UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-112(1) (KMM/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| TEZZAREE EL-AMIN CHAMPION, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Defendant Tezzaree El-Amin Champion should be sentenced to 140 months in prison for his fraud, money laundering, and illegal possession of a firearm after a felony conviction. Champion engaged in a sprawling, convoluted scheme using for-profit and non-profit entities to defraud a plethora of government agencies and private organizations. He defrauded the U.S. Department of Justice, the CDC Foundation, PayPal, the Small Business Administration, Hennepin County, the City of Minneapolis, the Minnesota Department of Education, the Minnesota Department of Human Services, the Minnesota State Arts Board, the Otto Bremer Trust, Youthprise, the Greater Twin Cities United Way, and individuals.

Champion's scheme caused an actual loss of approximately $3.5 million and an intended loss of approximately $6.5 million. But more than just taxpayer money was laid to waste. It was also the lost opportunity to achieve the goals of government and private foundations. Money intended for opioid recovery, offender reentry, small-business relief, and community arts was diverted. Public-spirited goals went unfulfilled. Trust was

undermined.

Worse yet, Champion used others to commit his fraud. In one part of the fraud, he recruited people—mainly people in tough life positions—on whose behalf he could submit fraudulent PPP, EIDL, and other applications for funding. They received a chunk of the money but also had to risk their credit and use their names and social security numbers. Champion diverted the risk to them and took kickbacks for himself.

Champion's conduct is made more serious by his illegal possession of a firearm at the same time as his fraud offense. Champion knew very well he was prohibited from possessing a firearm. In 2018 he was convicted of second-degree assault after shooting a man. Yet he possessed a gun anyway, at the same time he was committing fraud. A liar with a gun is a more serious than a mere liar because, as Al Capone said, "You can get further with a kind word and a gun than you can with just a kind word."[1]

Champion's crimes call for a sentence with a meaningful term of imprisonment.

## <u>BACKGROUND</u>

The following summary of Champion's conduct is based on the findings from Probation's presentence investigation report, the parties' stipulated facts in the plea agreement, and undisputed facts established by evidence.

## I.    In 2021, three tipsters separately reported suspected fraud by Champion.

In 2021, law enforcement received three separate, independent tips reporting suspected frauds by Champion. *First*, a contractor for Hennepin County's Small Business

---

[1] *The Untouchables* (Paramount Pictures 1987), clip available at
https://www.youtube.com/watch?v=znc982HgnUs.

Relief ("SBR") grant program received a call alleging that Champion had assisted a man in preparing a successful but fraudulent SBR grant application. The SBR program, funded with federal COVID-19 pandemic aid, authorized grants to local small businesses suffering from the pandemic. The contractor found the tip credible and alerted county law enforcement.

*Second*, a man named A.T.[2] reported to the Minneapolis Police Department that he was the victim of fraud. A.T. said Champion convinced him to pay $75,000 for an equity stake in a real-estate venture of Champion's, where Champion was seeking to flip blighted Minneapolis houses. A.T. said Champion orally promised to invest the funds into the houses, though that promise wasn't memorialized in the written contract. A.T. never received any money back and didn't see any improvements at the relevant properties. A.T. also met with Champion and Defendant Marcus Hamilton, who served as one of Champion's chief assistants, and they pitched him on participating in a PPP fraud scheme. A.T. rejected the offer for PPP fraud, then made his report to police.

*Third*, MPD learned of a lawsuit against Champion by a man named J.C. According to the suit, Champion recruited J.C. to invest in a venture to host an internationally famous hip hop artist at U.S. Bank Stadium. J.C. agreed and sold a restaurant he owned to fund the investment. Champion took the money. No concert occurred. Later, J.C. sued Champion in state court and won a $64,000 judgment, plus costs and interest.

---

[2] A.T. is Individual E in the indictment and PSR.

## II.    Agents found evidence of fraud, U.S. currency, and a gun at Champion's home.

After law enforcement received the three tips, a federal investigation began. The investigation led to a search warrant of Champion's home. In the house, agents found documents consistent with fraud. They also found $126,000 in U.S. currency in a safe placed inside a Rubbermaid tub in the basement:



*The $126,000, in a safe.*

In Champion's bedroom, agents found a Ruger LCR .357 revolver bearing serial number 54608402. Champion's DNA was on the firearm. Champion was, at the time, prohibited from possessing a firearm due to a 2018 Hennepin County conviction for second-degree assault with a dangerous weapon.

III.    **The investigation revealed Champion's $6.5 million scheme to defraud pandemic programs and other public and private funding authorities.**

The federal investigation continued, and revealed how Champion had devised and participated in a scheme to defraud a large variety of federal, state, local, and private COVID-19 relief programs and other sources of funding. The scheme resulted in an actual and intended loss of approximately $6.5 million and an actual loss of approximately $3.5 million.

There were two main parts to the scheme:

### A.    *Futuristic Management Group*

In the first part of the scheme, Champion used a for-profit marketing company that he controlled, called Futuristic Management Group LLC ("FMG"), to fraudulently obtain pandemic-related loans, grants, and contracts. This part of the scheme caused more than $2.1 million in actual and intended loss.

FMG was officed at a WeWork-style shared workspace in the North Loop neighborhood of Minneapolis, at 121 North Washington Avenue. Through FMG, Champion recruited clients and assisted them with fraudulent applications for COVID-19 loan and grant programs. These programs included the SBA's Paycheck Protection Program ("PPP"), the SBA's Economic Injury Disaster Loan program ("EIDL"), and Hennepin County's SBR grant program. Champion also submitted nine fraudulent applications on his own behalf. The applications dramatically overstated applicant income and expenses and were supported by fake tax records and fake lease documents. Clients paid kickbacks to Champion and Hamilton in return for their assistance.

Champion's role was to serve as FMG's CEO. He devised the scheme, recruited clients to submit fraudulent applications, obtained fake documents to support the false claims in the fraudulent applications, and assisted clients in submitting the applications. Hamilton assisted Champion with the submission of applications.

At the same time Champion was assisting clients with fraudulent loan and grant applications, he used his clients to defraud Hennepin County's Elevate Business program. Under the Elevate Business program, the County hired FMG to provide free marketing services to local small businesses. But rather than provide free services, Champion double-dipped: he billed and received payments from the County for services for which he had already been paid by his clients. Many of these clients were the same businesses and individuals Champion had assisted with false PPP, EIDL, and SBR applications.

An example shows how the FMG part of the scheme worked: Champion and Hamilton agreed to help J.S.[3] submit a fraudulent PPP application in the name of Knowledge Is Power LLC. To support the PPP application, Champion obtained a fake tax document falsely stating Knowledge Is Power had approximately $530,000 in gross income in 2019 and had paid out about $360,000 in wages. As Champion knew, Knowledge Is Power and J.S. had incomes far below $530,000 in 2019. Supported by the fake tax document, Champion and Hamilton then helped J.S. draft and submit a PPP application. The application requested and claimed eligibility for a loan of more than $95,000. But neither Knowledge Is Power nor J.S. was in fact eligible for the PPP loan,

---

[3] J.S. is Individual C in the indictment and the PSR.

and Champion knew as much.  The application was approved.  J.S. received a wire transfer to his bank account of $95,833 in loan funds.  After receiving the funds, at Champion and Hamilton's direction, J.S. withdrew $31,000 of the fraud proceeds from his bank— including a withdrawal of $15,000 in cash on April 13, 2021—and paid those funds to Champion and Hamilton as compensation for their assistance.

Also, Champion falsely claimed in an Elevate Business invoice to Hennepin County that FMG provided 50 hours of assistance to Knowledge Is Power regarding "website, graphics, logo, business writing."  In fact, Champion charged Knowledge Is Power for that work, rather than provide it at no cost as required by the Elevate Business program.  In response to the fraudulent Elevate Business invoice, FMG received a $15,000 check from Hennepin County.

In another example, Champion assisted T.J.[4] in submitting successful but fraudulent EIDL and SBR applications for a boxing business that had never actually existed.  As with Knowledge Is Power, Champion obtained fake tax documents that were submitted in support of T.J.'s applications, falsely asserting that T.J.'s non-existent boxing business had more than $300,000 in gross receipts in 2019.

---

[4] T.J. is Individual A in the indictment and the PSR.



*The fake tax form submitted with T.J.'s SBR application.*

T.J. received approximately $134,000 in grants and loans from the fraudulent applications. He then transferred at least $125,000 of that amount to Champion. Some transfers were to compensate Champion for assistance with the applications. Others T.J. viewed as investments in properties managed by Champion (like A.T.).

T.J. never received a dollar back from Champion. Eventually, the government requested that T.J. repay his $104,900 EIDL loan.

In another part of the FMG aspect of the scheme, Champion submitted two fraudulent applications on FMG's behalf seeking loans marketed by PayPal Business Loan and issued by WebBank. In the applications, dated April 2022 and February 2023, Champion falsely overstated the company's gross sales. He also attached fake Wells Fargo bank statements that inflated his account balances and deposits. In response to the false applications, WebBank issued FMG approximately $157,000 in loans. More than $110,000 was never repaid.

### B.    Encouraging Leaders

Champion conducted the second part of his fraud scheme through Encouraging Leaders, a non-profit organization also located at the North Loop co-working space at 121 North Washington Avenue. Champion founded and led Encouraging Leaders.

The organization's mission was nominally to empower underrepresented youth in Minneapolis, but Champion used the organization to fraudulently obtain funding from federal, state, local, and private grant-making entities. Champion misused large portions of the funds, for example by transferring organizational funds to himself and using them for personal matters. This part of the scheme resulted in more than $3.8 million of actual and intended loss.

Specifically, under Champion's direction, Encouraging Leaders submitted at least 42 fraudulent grant and public-contract applications and follow-up correspondence containing material false misrepresentations, in order to obtain funding. Victims of the grant and public-contract fraud included Hennepin County, the City of Minneapolis, the U.S. Department of the Justice, the Center for Disease Control Foundation, the Minnesota Department of Education, the Minnesota Department of Human Services, the Minnesota State Arts Board, the Otto Bremer Trust, Youthprise, and the Greater Twin Cities United Way.

Under Champion's direction, Encouraging Leaders' false statements to grant-making organizations included false rosters of the board of directors; false assertions that Encouraging Leaders had been independently audited; false claims of support and fake letters of support purporting to show partnership with local governments, companies, and

community organizations; requests for payments based on overstated hours of work; and false claims that Encouraging Leaders administered events that either never occurred or were organized by others.

At Champion's direction, Encouraging Leaders also created and maintained false records—edited expense reports, fake board minutes, and forged event sign-in sheets—to protect Champion and the organization in the event of an audit.

Champion then spent and took for himself significant portions of the grant funds. He falsely registered individuals not employed at Encouraging Leaders with W-2s, then paid himself; he transferred money into difficult-to-trade cryptocurrency accounts; and he took lavish personal trips then billed them to the organization as business expenses.

Based on the fraudulent applications, Encouraging Leaders sought more than $3.8 million in funding through 42 grants, was awarded 27 grants for more than $2.7 million in funding, and actually received approximately $1.5 million in funding.

For example, in 2021, Encouraging Leaders applied for and was awarded a $702,864 grant from the U.S. Department of Justice's Office of Juvenile Justice Delinquency Prevention, as part of an opioid-affected youth initiative. Champion signed the application and award contract. Champion's proposal was to conduct a "Project Healings," which would use data, training, and outreach to ensure equitable access to public resources.

In the application, Champion included a bevy of falsehoods. He falsely stated that the City of Minneapolis's health department and Hennepin County's health department had agreed to partner in the grant project. They had not. He submitted forged commitment

letters of support from local organizations CrossRoads Panorama and Minnesota Preparatory Academy. They had not agreed to partner with Champion. The application claimed the project would be led in part by Encouraging Leaders' board of directors. There was no board. No board had ever met. Champion signed a financial disclosure for Encouraging Leaders, asserting the organization had been audited by a specific firm in the last two years. No such audit occurred.

Champion's budget in support of the project promised he would devote 50% of his efforts to the project, and Hamilton would devote 100% of his efforts. Encouraging Leaders billed the Department of Justice based on those amounts. But Champion and Hamilton were not devoting 50% and 100% of their respective efforts. Hamilton was not working at all for Encouraging Leaders for significant parts of the grant period—he left the organization in the fall of 2021 and did not return until late 2022, an update never shared with the Department. And Champion was claiming to work more hours than there were in a work week, according to the aggregated representations that Encouraging Leaders made to grant-making organizations, including the Department of Justice.

After receiving the award from the Department of Justice, Champion hired E.A.[5] to draft false grant progress reports. E.A. was a freelancer living in Africa. At Champion's direction, E.A.—working remotely for Champion from Africa—used the Project Healings grant proposal and supporting materials to draft a fictional narrative of work that fit the description of what Encouraging Leaders had promised to do, even though Encouraging

---

[5] E.A. is Individual G in the plea agreement and the PSR.

Leaders had not actually done the work. Encouraging Leaders then submitted the false reports to the Department.

In total, in response to Champion's and Encouraging Leaders' fraudulent statements to the U.S. Department of Justice, Encouraging Leaders was paid $393,892 of the overall $702,864 Project Healings grant award.

\*          \*          \*

In total, Champion's fraud scheme—including both the FMG and Encouraging Leaders aspects of the scheme—involved an intended loss of approximately $6.5 million and an actual loss of approximately $3.5 million, as detailed in the following table.

**OVERAL LOSS SUMMARY**

| FMG Covid Relief Fraud: | Amount Funded | Amount Requested | # of Applications |
|---|---|---|---|
| EIDL | $ 423,200.00 | $ 428,200.00 | 44 |
| PPP | $ 1,108,543.33 | $ 1,272,060.33 | 34 |
| Hen County Small Business Relief | $ 229,400.00 | $ 235,000.00 | 30 |
| Hen County Elevate Business | $ 65,000.00 | $ 65,000.00 | 4 |
| Fraudulent Paypal Loans: | $ 110,000.00 | $ 157,000.00 | 2 |
| | $ 1,936,143.33 | $ 2,157,260.33 | |
| | | | |
| **EL Grant Fraud:** | | | |
| Funded Grants | $ 1,543,432.08 | $ 2,769,839.00 | 27 |
| Denied Applications | $ - | $ 1,531,851.20 | 15 |
| | $ 1,543,432.08 | $ 4,301,690.20 | |
| | | | |
| **TOTAL FUNDED/ RESTITUTION** | $ 3,479,575.41 | $ 6,458,950.53 | TOTAL INTENDED LOSS |

## IV. Witnesses commented about Champion's possession of firearms.

During the investigation, two witnesses discussed Champion relationship with firearms during the fraud scheme. M.T.,[6] who received a fraudulent EIDL loan through a Champion referral, said Champion told him during a meeting at the FMG office that he always carried a firearm. M.T. understood the comment to mean that at that moment Champion was carrying a firearm.

---

[6] M.T. is Individual D in the indictment and PSR.

Similarly, A.T.—one of the initial tipsters—said he saw the outline of a firearm in the exterior fabric of a bag, suggesting a gun was inside, during a meeting with Champion and Hamilton at the 121 North Washington office to discuss the PPP scheme. The bag belonged to Champion. When the apparent firearm's shape was pointed out to Champion, he told A.T. he always carried a firearm, according to A.T.

## ARGUMENT

### I.    The Guidelines recommend 135 to 168 months of imprisonment.

A 135-to-168-month term of imprisonment is recommended by the Sentencing Guidelines, based on a total offense level of 31 and a criminal history category of III.

### A.    Objections

The government maintains two objections to the PSR, consistent with the parties' stipulations in the plea agreement.

*First*, the gun enhancements should not apply. The PSR concluded two gun enhancements apply, one for the fraud and money laundering counts, and one for the gun count, based on Champion possessing a firearm "in connection with" his fraud offense. (PSR ¶¶ 75, 82.) Specifically, due to the gun issue, the PSR applied a 2-level increase under the fraud guidelines, pursuant to § 2B1.1(b)(16)(B), and a 4-level increase from the felon-in-possession guidelines, under § 2K2.1(b)(6)(B). With the grouping rules, the net result would be a 2-level overall increase to Champion's Guidelines.

Champion certainly possessed a firearm, and absolutely committed fraud, money laundering, and illegally possessed a firearm, but a connection between the offenses is not established by a preponderance of the evidence. Three pieces of evidence relate to the

14

potential connection: (*i*) the presence of the firearm in the same home where Champion kept fraud proceeds and documents relating to fraud, (*ii*) M.T.'s statement that Champion implied he was carrying a firearm during a fraud meeting, and (*iii*) A.T.'s statements that Champion possessed an unseen gun in a bag during a fraud meeting. Based on the government's assessment of the appropriate weight that a factfinder would give these pieces of evidence, and noting that neither M.T. nor A.T. actually saw Champion possess a firearm, the government believes the preponderance of this evidence would not establish a connection between the offenses.

With respect to the role adjustment, the government maintains its objection that a two-level increase should apply, rather than the four-level increase the PSR applied for Champion's role as an organizer or leader of criminal activity involving five or more people or that was otherwise extensive. (PSR ¶¶ 78.)

**B.    *The Guidelines.***

1. <u>The total offense level is 31.</u>

Champion is guilty of three offenses:

*Count Six – Wire Fraud*: The base offense level is 7, because wire fraud has a statutory maximum of 20 years or more. U.S.S.G. § 2B1.1(a)(1). The following specific-offense characteristics apply:

| Levels | USSG Authority | Reason |
|--------|----------------|--------|
| +18 | § 2B1.1(b)(1)(J) | loss more than $3,500,000 but not more than $9,500,000 |
| +2 | § 2B1.1(b)(2)(A) | 10 or more victims |
| +2 | § 2B1.1(b)(10)(B), (C) | substantial conduct outside the United States and sophisticated means |
| +2 | § 2B1.1(b)(12) | fraud in connection with major disaster or emergency benefits |
| Total Change:  +24 | | |

A 2-level increase applies for Champion's role as an organizer or leader. U.S.S.G. § 3B1.1(c). The subtotal offense level is 33.

*Count Eight – Section 1957 Money Laundering*:  The base offense level is 33, because that is the subtotal offense level for the underlying wire-fraud offense. U.S.S.G. § 2S1.1(a)(1). Because Champion is guilty of a money-laundering violation of 18 U.S.C. § 1957, a 1-level increase applies. U.S.S.G. § 2S1.1(b)(2)(A). The 2-level increase for Champion's role as an organizer or leader again applies. U.S.S.G. § 3B1.1(c). The subtotal offense level is 34.

*Count Nine – Felon in Possession of Firearm*:  The base offense level is 20, because the instant offense occurred after Champion was convicted of a crime of violence. U.S.S.G. § 2K2.1(a)(4)(A). No specific-offense characteristics apply. No role enhancement applies.

*Multiple Counts:*  The fraud and money-laundering offenses group with each other because the offenses involve the same victim and the same scheme. The offense level for the group is equivalent to the money-laundering count—34 levels—because that offense

has the higher offense level. The fraud and money-laundering counts do not group with the firearms count, which has a subtotal offense level of 20. Because the money-laundering offense level is higher than the firearms offense level, the money-laundering offense level governs. And because the difference in offense levels between the two groups is greater than nine, there is no additional increase in offense levels under the multiple-counts guidelines.

With a 3-point reduction for acceptance of responsibility, the combined total offense level is 31.

### 2. Champion is in criminal history category III.

The PSR accurately reflects that Champion falls in criminal history category III due to 3 criminal history points he receives for a 2018 second-degree assault with a dangerous weapon, and 1 criminal history point for a 2020 DUI.

### 3. The Guidelines recommend a 135-to-168-month term of imprisonment.

With a total offense level of 31, and a criminal history category of III, the Guidelines recommend a sentence of 135 to 168 months in prison. U.S.S.G. § 5A.

## III. 18 U.S.C. § 3553: A sentence of 140 months is necessary and sufficient to meet the principles of punishment.

A sentence of 140 months in prison and is necessary and sufficient to meet the principles of punishment reflected in 18 U.S.C. § 3553(a). Four reasons indicate this is the correct result:

*First*, Champion's offense was extremely serious. He defrauded nearly every agency and every program he could find: PPP, EIDL, SBR, Elevate Business, PayPal,

17

DOJ's Opioid Affected Youth Initiative, the CDC Foundation, MDE, Minnesota DHS, the Minnesota State Arts Board, the Otto Bremer Trust, Youthprise, and the Greater Twin Cities United Way. If it could be defrauded, Champion sought to defraud it.

And Champion's efforts were successful. He actually obtained approximately $3.5 million in funding, while attempting to obtain another $3 million more. These losses should be counted not just in dollars and cents of taxpayer money. They must also be counted as dollars that could not be given to worthy applicants who would have actually sought to fulfill the public-spirited goals behind the programs, the work that Champion falsely promised he would carry out. Opioid recovery, small-business relief, offender reentry, community arts—each of these efforts were harmed due to Champion's actions. Society is poorer. Trust in public programs was diminished.

Worse yet, Champion used others in his fraud efforts. He used business entities like FMG and Encouraging Leaders and the trappings of a legitimate organization's workplace to recruit others to his fraud. Some, like Hamilton, became employees and coconspirators. Others were vessels for kickbacks from fraudulent PPP and EIDL loans and grants. Champion shifted risk onto others by using their names, social security numbers, and credit to submit the fraudulent applications, while still profiting from the kickbacks. Some, like T.J., are now stuck repaying Champion's fraud proceeds to the government.

*Second*, Champion's illegal possession of a firearm during his fraud offense is a aggravating factor that weighs heavily. Champion shot a man in 2017, was convicted for the offense in 2018, was released from prison in 2019, then promptly began his fraud scheme and acquired another gun. Champion talked about his guns with others in the fraud

scheme.  He was proud of his gun, even though he was prohibited.  Champion's gun-and-fraud conduct must be addressed with a meaningful sentence.

*Third*, Champion is at serious risk of recidivism.  He committed his second-degree assault at age 20.  Undeterred after being released at approximately age 22, he quickly began his spree of fraud—first against J.C. and A.T., and then against a multitude of government and private programs.  The sentence in this case must break the pattern, and stop Champion from future criminal activity.

*Fourth*, a sentence of 140 months would not create unwarranted sentencing disparities.  U.S. Sentencing Commission data includes 18 defendants sentenced under § 2S1.1 with a total offense level of 31 and a criminal history category of III.[7]  For those defendants, the average sentence was 114 months and the median was 120 months.  Four additional defendants were sentenced under § 2B1.1 with the same offense level and criminal history category.  Their average sentence was 152 months and the median was 135 months.  These sample sizes are small, but they indicate that 140 months is within the general range of sentences given to other somewhat similarly situated defendants.

---

[7] https://jsin.ussc.gov/analytics/saw.dll?Dashboard  (last visited Nov. 13, 2025).

## <u>CONCLUSION</u>

The appropriate sentence for Champion's wire-fraud, money-laundering, and firearms offenses is 140 months.

Respectfully submitted,

Dated:  November 13, 2025

DANIEL N. ROSEN
United States Attorney

*/s/ Matthew D. Forbes*

Joseph H. Thompson
Matthew D. Forbes
Assistant U.S. Attorneys